UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
TACOMA DIVISION

| | |
|---|---|
| IRON PARTNERS, LLC, an Oregon limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>YAMILEE VOLCY, in her official capacity as Acting Director of the Washington Division of the Federal Highway Administration; KEITH LYNCH, in his official capacity as Administrator of the Oregon Division of the Federal Highway Administration; SUSAN KAY FLETCHER, in her official capacity as Administrator of Region 10 of the Federal Transit Administration; SEAN MCMASTER, in his official capacity as Administrator of the Federal Highway Administration; MATTHEW CAHILL, in his official capacity as Acting Deputy Administrator and Chief Counsel of the Federal Transit Administration; SEAN P. DUFFY, in his official capacity as Secretary of the United States Department of Transportation; FEDERAL HIGHWAY ADMINISTRATION, an agency of the U.S. Department of Transportation; FEDERAL TRANSIT ADMINISTRATION, an agency of the U.S. Department of Transportation; UNITED STATES DEPARTMENT OF TRANSPORTATION,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>NATIONAL ENVIRONMENTAL POLICY ACT, 42 U.S.C. §§ 4321–4337; ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706; SURFACE TRANSPORTATION ACT, 23 U.S.C. § 139; RIVERS AND HARBORS ACT OF 1899, 33 U.S.C. § 401 |



SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Vancouvercenter
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone 360-694-7551

## I. Introduction

1. On July 1, 2026, the Federal Highway Administration and Federal Transit Administration signed an Amended Record of Decision ("ROD") for the Interstate Bridge Replacement ("IBR") Program. The ROD approved an alternative for the replacement of the Interstate Bridge between Portland, Oregon and Vancouver, Washington that includes a fixed span design with a maximum of 116 feet of vertical clearance above the Columbia River. The Amended ROD was based on faulty environmental documents which failed to adequately evaluate alternatives, failed to take a hard look at navigational impacts, and approves an alternative with a design that unreasonably restricts navigation. The Amended ROD and underlying documents violate applicable laws including the National Environmental Policy Act ("NEPA") and the Rivers and Harbors Act of 1899 as amended.

## II. Parties

2. Plaintiff Iron Partners, LLC, is a limited liability company organized under the laws of the State of Oregon. Iron Partners is the owner of Building 48 along the industrial waterfront of Vancouver, Washington, at 3515 SE Columbia Way.

3. Defendant Yamilee Volcy signed the Amended ROD at issue in this case. She is Acting Director of the Washington Division of the Federal Highway Administration ("FHWA") based in Olympia, Washington. Defendant Volcy is sued in her official capacity.

4. Defendant Keith Lynch also signed the Amended ROD. He is Administrator of the Oregon Division of the Federal Highway Administration based in Salem, Oregon. Defendant Lynch is sued in his official capacity.

5. Defendant Susan Kay Fletcher also signed the Amended ROD. She is Administrator of Region 10 of the Federal Transit Administration ("FTA") based in Seattle, Washington. Defendant Fletcher is sued in her official capacity.

6. Defendant Federal Highway Administration is an agency of the Department of Transportation with the responsibility for compliance with all laws relating to highway



SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Vancouvercenter
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone 360-694-7551

development projects under its jurisdiction. Defendant Sean McMaster is Administrator of FHWA based in Washington, D.C. and is sued in his official capacity.

7. Defendant Federal Transit Administration is an agency of the Department of Transportation with the responsibility for compliance with all laws relating to highway development projects under its jurisdiction. Defendant Matthew Cahill is Acting Deputy Administrator of FTA based in Washington, D.C. and is sued in his official capacity.

8. Defendant United States Department of Transportation is the parent agency of FHWA and FTA and has ultimate responsibility for all decisions made by FHWA and FTA. Defendant Sean P. Duffy is Secretary of the United States Department of Transportation based in Washington, D.C. and is sued in his official capacity.

## III. Jurisdiction and Venue

9. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as the claims all involve questions of federal law. The defendants' sovereign immunity is waived by 5 U.S.C. § 704, which provides that "final agency action for which there is no other adequate remedy in a court" is subject to judicial review. Jurisdiction is also provided for by 23 U.S.C. § 139.

10. Venue is proper in this District under 28 U.S.C. § 1391(e)(1). Defendants Volcy and Fletcher reside in this district, making venue proper under 28 U.S.C. § 1391(e)(1)(A). Additionally, Iron Partners' property and many of the effects of the action are within this District, making venue proper under 28 U.S.C. § 1391(e)(1)(B).

11. Venue is appropriate in the Tacoma Division because the property at issue and a substantial part of the effects of the decision occur within Clark County. Additionally, Defendant Volcy resides in Thurston County.

## IV. Legal Background

12. The National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA") requires that federal agencies publish an environmental impact statement ("EIS") before taking a "major federal action" that will "significantly affect[] the quality of the human



SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Vancouvercenter
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone 360-694-7551

environment." 42 U.S.C. § 4332(C). In the EIS, federal agencies must take a hard look at the potential effects of their proposed actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

13. Judicial review of agency action under NEPA is governed by the Administrative Procedure Act ("APA"). *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 375 (1989). The APA dictates that courts must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). An agency's decision is arbitrary and capricious if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

14. The APA provides for judicial review of a "final agency action for which there is no other adequate remedy in a court" by persons aggrieved by such action. 5 U.S.C. § 702. Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

15. When an Environmental Impact Statement is prepared, NEPA requires that it address several elements:

(i) reasonably foreseeable environmental effects of the proposed agency action;

(ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;

(iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;



SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Vancouvercenter
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone 360-694-7551

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

(v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

42 U.S.C. § 4332(C).

16. NEPA additionally requires that agencies "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document;" 42 U.S.C. § 4332(D); "make use of reliable data and resources in carrying out this chapter;" 42 U.S.C. § 4332(E); and "consistent with the provisions of this chapter, study, develop, and describe technically and economically feasible alternatives;" 42 U.S.C. § 4332(F).

17. FHWA and FTA have issued joint regulations to implement NEPA at 23 C.F.R. Part 771. These regulations require a draft EIS to "evaluate a reasonable range of alternatives to the action and document the reasons why other alternatives, which may have been considered, were eliminated from detailed study." 23 C.F.R. § 771.123(c). The draft EIS must also summarize the studies, reviews, consultations, and coordination required by "environmental laws or executive orders to the extent appropriate at this stage in the environmental process." *Id.*

18. For a Final EIS, the joint regulations require the document to "identify the preferred alternative and evaluate all reasonable alternatives considered." 23 C.F.R. § 771.125(a)(1). It must also "discuss substantive comments received on the draft EIS and responses thereto, summarize public involvement, and describe the mitigation measures to be incorporated into the proposed action." *Id.* "The final EIS should also document compliance, to the extent possible, with all applicable environmental laws and executive orders, or provide reasonable assurance their requirements can be met." *Id.* Additional NEPA procedural requirements are set forth in 23 U.S.C. § 139.

19. Section 9 of the Rivers & Harbors Act of 1899, 33 U.S.C. § 401, requires a



SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Vancouvercenter
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone 360-694-7551

permit from the Coast Guard before a bridge may be constructed across navigable waters of the United States. Coast Guard bridge permit regulations similarly state that "a bridge cannot lawfully be constructed across any navigable waterway of the United States until the location and plans have been approved by the Coast Guard." 33 C.F.R. § 115.50(b).

20. The purpose of the Rivers & Harbors Act "is to protect, preserve, and make safe the Nation's navigable waterways. …" *United States v. Fed. Barge Lines, Inc.*, 573 F.2d 993, 997 (8th Cir. 1978). This is because "navigable streams belong to the public, and it is to protect the public in the enjoyment of such right that it is made unlawful to obstruct … a navigable stream…." *Dow Chem. Co. v. Dixie Carriers, Inc.*, 330 F. Supp. 1304, 1307 (S.D. Tex. 1971), *aff'd*, 463 F.2d 120 (5th Cir. 1972) (quoting *F.S. Royster Guano Co. v. Outten*, 266 F. 484, 486 (4th Cir. 1920)). The Act codifies the common-law rule that a bridge "is an obstruction to navigation tolerated because of necessity and convenience to commerce upon land. Such a structure must be so maintained and operated that navigation may not be impeded more than is absolutely necessary, the right of navigation being paramount." *Clement v. Metro. W. Side Elevated R. Co.*, 123 F. 271, 273 (7th Cir. 1903). In other words, not only does the Act require a permit, but it requires that a crossing does not unreasonably obstruct the paramount needs of navigation.

21. The General Bridge Act of 1946, 33 U.S.C. § 525, also requires a permit to be issued before any bridge over the navigable waters of the United States may be constructed.

## V. <u>Factual Allegations</u>

22. In collaboration with state agencies, defendants have been attempting to analyze a replacement for the Interstate Bridge for over a decade. The prior version of the project, the Columbia River Crossing ("CRC") issued a ROD in 2011. The CRC ROD approved a fixed span with 116 feet of vertical clearance despite substantial evidence of navigational needs for a higher bridge.

23. The CRC project was never constructed due to a lack of funding.



SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Vancouvercenter
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone 360-694-7551

Subsequently, the Coast Guard revised its entire Bridge Permit application procedures in order to avoid issuing a permit like the one for CRC.

24. When the IBR Program started, it reused the environmental documents prepared for CRC. As part of that process, the Coast Guard issued a Preliminary Navigation Clearance Document ("PNCD") in 2022. In the PNCD, the Coast Guard found that the needs of navigation required the Columbia River to "continue to provide [Vertical Navigation Clearance or VNC] equal or greater than the existing I-5 twin bridges of 178 feet." The Coast Guard concluded that "the current proposed bridge with 116 feet VNC … would create an unreasonable obstruction to navigation for vessels with a VNC greater than 116 feet and in fact would completely obstruct navigation for such vessels for the service life of the bridge which is approximately 100 years or longer."

25. The Coast Guard explained its rationale on several grounds. First, it stated the agency "does not approve bridge proposals with vertical navigation clearances below the 'present governing structure' when the existing VNC has been and is currently needed unless there is a compelling *navigational* reason to do so." (Emphasis added). Second, the information provided to the Coast Guard "clearly document[ed] that the existing waterway characteristics (natural and manmade) east of the existing I-5 twin bridges have historically supported, currently support, and are capable of continuing to support international ocean-going navigation along the [Marine Transportation System] for vessels/cargos with VNCR of up to 178 feet." The Coast Guard noted that "as vessels and their cargos are trending larger, it is reasonable to believe that the waterway east of the existing I-5 twin bridges could be improved (additional dredging) to support even larger vessels." Moreover, "Regional waterway characteristics are such that there are no alternate routes for vessels to transit from the Pacific Ocean upriver past the current I-5 twin bridges." Third, the Coast Guard expressed concerns that lower bridge clearance would endanger emergency response and national security. Fourth, it noted commercial navigation trends including larger vessels.



SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Vancouvercenter
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone 360-694-7551

Fifth, it described the unique manufacturing capabilities available upstream of the Interstate Bridge (which include the area where Iron Partners operates).

26. During development of the CRC, marine contractors informed the CRC that they use the river on an as-needed basis year round. Air drafts ranged from 20 feet to 131 feet and the Port of Portland's Dredge *Oregon* has an air draft of 103 feet. Further, the CRC identified federal government users including USACE Hopper Dredge *Yaquina* with an air draft of 92 feet and Puget Sound Naval Shipyard nuclear transporters that include barges and escorts. The CRC found that marine industries and fabricators ship products or have vessels transiting under the I-5 bridges on an as-needed basis all months of the year. The air drafts ranged from 60 feet to 141 feet. The CRC specifically identified 11 vessels/users who would be unable to use a 116-foot bridge.

27. In preparing its 2021 Navigation Impact Report ("NIR"), however, IBR identified just a "single vessel (barge-based construction equipment) and 3 users (metal fabricators) with potential future shipments" as "the only existing river users identified that could be impacted by a bridge height of 116 feet based on their current business plans." IBR did not clearly explain the discrepancy between this finding and the data collected by CRC. Publicly available data indicated at least *49 vessels* that have sought bridge lifts at or above 115 feet from the river.

28. Additionally, the March 26, 2025 allision of *M/V Dali*, which caused most of Baltimore's Francis Scott Key Bridge to collapse, highlights the need to maintain adequate horizontal clearances in light of ever larger and heavier vessel traffic. One advantage of a movable span option for the IBR is that it will not require relocation of the main channel and will require less maneuvering for vessels passing through the area. It is a maritime truism that increased maneuvering increases collision risk.

29. The IBR Program prepared a new and incomplete Navigational Impact Report in 2025 which is incorporated into the FSEIS on which the Amended ROD is based. The



SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Vancouvercenter
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone 360-694-7551

revised Navigation Impact Report does nothing to change the prior finding. For one, as indicated in a subsequent Coast Guard public notice, the NIR failed to account for many of the recent openings of the bridge. The NIR failed to identify how the bridge project services the needs of navigation. It also failed to identify Iron Partners within its analysis of water-dependent industrial sites.

30. The Coast Guard quietly revised its bridge permit process to remove protections for navigation in early 2025. It removed or relaxed all language about presumptive denial where air draft is lowered, or navigation restricted. The Coast Guard did not take public comment on this change. Nor were any of the underlying statutes or regulations changed.

31. Following these changes and relying on the inadequate NIR, the Coast Guard subsequently issued a new, bare-bones PNCD which approved a vertical clearance of 116 feet. The Final SEIS incorporated the NIR as its analysis of navigational impacts and was relied on in the Amended ROD.

32. The project as described in the Amended ROD will permanently and inalterably harm and undermine Iron Partners' manufacturing capacity.

33. Iron Partners' principals have been involved in maritime industrial manufacturing for 40 years on the Washington side of the Columbia River. In the late 1960s and early 1970s, this site was utilized for the fabrication of offshore drilling platforms for Cook Inlet Alaska and for the California Coast. In the period of oil expansion, American Pipe constructed three units for Alaska, each exceeding 4,000 tons in finished weight, and three for California weighing some 1,800 tons each. The effort was a boon to local employment requiring more than 800 hourly workers onsite seven days a week to complete. These enormous structures had less than 12 feet of clearance in all dimensions when transported by tow or barge through the existing 178′ lift span bridge.

34. The site was then used for the fabrication, assembly, and painting of double



SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Vancouvercenter
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone 360-694-7551

box girders used in the construction of an Oregon section of the I-205 bridge between West Linn and Oregon City.

35. Iron Partners' principals also built critical components of the Ground Based Missile Defense, subsequently transported by barge to Alaska. Following this work, their company fabricated segments for new navigation locks that were installed on the Columbia River system. In addition, Iron Partners' principals built removable spillway weirs for Lower Monumental Dam, part of the Federal Columbia River hydro system infrastructure, as well as girders for San Francisco Oakland Bay Bridge. All of these projects relied on the lifting capacity of the existing bridge.

36. The land that has facilitated all of this activity is home to Bldg. 48, which sits on approximately 10 acres of industrial land and has permanent access to water side infrastructure. Bldg. 48 is the newest and largest fabrication center located within the Columbia River maritime industrial area east of the I-5 bridge. It can produce the largest fabrications of any fabricator currently located in the area.

37. A bridge height of 116 feet, as proposed by the fixed span alternative, will permanently and negatively impact the economic viability of Iron Partners' facility for heavy manufacturing for industries that relate to national security, military, as well as critical regional and national infrastructure. There are no alternative navigation routes available that can provide navigation access to Iron Partners' facility to vessels and cargo ships with air draft requirements greater than 116 feet. Thus, the proposed bridge height effectively eliminates Iron Partners' access to essential navigation.

## VI. <u>Claims for Relief</u>

### FIRST CLAIM FOR RELIEF

### (Violation of NEPA – Failure to Evaluate Reasonable Range of Alternatives)

38. Paragraphs 1–37 are incorporated by reference.

39. Although the Final SEIS includes a movable-span option at the insistence of



SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Vancouvercenter
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone 360-694-7551

the Coast Guard, the treatment of that option is inadequate. It is presented only as a design alternative rather than a full alternative, which precludes full public understanding of the effects of the project.

40. There is not nearly the level of detail regarding the movable span as compared to the fixed span. This is inconsistent with FHWA regulations at 23 C.F.R. § 771.123, which instruct that while one alternative may be developed in more detail than others, "[t]he development of such higher level of detail must not prevent the lead agency from making an impartial decision as to whether to accept another alternative that is being considered in the environmental review process." The FSEIS does not explain why the movable-span would have a minimum height of 92 feet when closed—compared to lower heights, this would seem to dramatically increase cost.

41. The project should have considered varying heights that would optimize both cost and navigation, rather than designing the most expensive alternative to make a movable span seem less viable.

42. Thus, the evaluation of alternatives in the FSEIS violates NEPA.

**SECOND CLAIM FOR RELIEF**

**(Violation of NEPA – Failure to Take Hard Look at Navigational Impacts)**

43. Paragraphs 1–42 are hereby incorporated by reference.

44. NEPA requires agencies to take a "hard look" at each environmental consequence of the action, which means a reasonably thorough evaluation of the environmental baseline and the effects of the action. *See*, *e.g.*, *Arizona Mining Reform Coal. v. United States Forest Serv.*, 172 F.4th 641, 661 (9th Cir. 2026); *Beyond Nuclear, Inc. v. U.S. Nuclear Regul. Comm'n*, 182 F.4th 977, 980 (D.C. Cir. 2026). A hard look ensures that "important effects will not be overlooked or underestimated only to be discovered after resources have been committed." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).



SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Vancouvercenter
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone 360-694-7551

45. Defendants did not take a hard look at the navigational impacts of the proposed Interstate Bridge Replacement. They used inaccurate data, ignored significant impacts, and mischaracterized relevant data.

46. The NIR was used to establish baseline conditions for the FSEIS. As described above, this description was inaccurate and incomplete and did not account significant numbers of vessels that requested bridge lifts or needed higher clearance. NEPA requires that baseline conditions be adequately and accurately described. Without establishing the baseline conditions which exist in the vicinity of a project *before* work begins, "there is simply no way to determine what effect the proposed [action] will have on the environment and, consequently, no way to comply with NEPA." *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci,* 857 F.2d 505, 510 (9th Cir. 1988). If the baseline description contains "inaccurate information and unsupported assumption[s]," it will "materially impede[] informed decision[-]making and public participation." *Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016).

47. In June 2022 the Coast Guard issued a Preliminary Navigation Clearance Determination ("PNCD") of 178 feet. The Coast Guard based this conclusion on both its policies and its evaluation of the facts. Coast Guard policy, prior to the change in 2025, will not approve lowering of vertical clearances when the existing clearance is needed "unless there is a compelling *navigational* reason to do so" (emphasis added). In the PNCD, the Coast Guard identified four existing vessels that may need up to 178′ clearance and noted future national security or emergency response needs may necessitate passage of large vessels. It also remarked on the trend of commercial vessels getting larger, identifying two recent visiting vessels with very high vertical clearance needs.

48. The Navigation section of the FSEIS acknowledges none of these facts. It minimizes the need for higher clearance for industrial and dredging vessels and claims that requests for bridge openings declined significantly. It does not explain what trends have



SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Vancouvercenter
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone 360-694-7551

been observed in vessels needing more than 116 feet of vertical clearance. It also claims that only eight users would be precluded from use of the river by the fixed span. But focusing on the number of users is misleading, as the products that transit to and from Iron Partners have much higher economic value than, for example, recreational traffic.

49. The FSEIS acknowledges "however, the Modified LPA with either the double-deck fixed-span or single-level fixed-span configuration would limit future navigation by introducing a *permanent and complete obstruction* to navigation upstream of the new Columbia River bridges for vessels or cargo loads with vertical clearance requirements greater than 116 feet" (emphasis added). The FSEIS does not attempt to quantify or otherwise explore these consequences; instead, it just assumes that its lack of knowledge of future plans is conclusive. This falls far short of a hard look.

50. Regarding future navigational needs, the NIR (which is incorporated into the FSEIS) offers no qualitative or quantitative analysis. It does not attempt to ascertain what future needs might be, despite acknowledging that a fixed span would limit navigational access for the next century. The NIR merely states that "[f]uture Maritime Transportation System demands and the associated need for bridge openings for the 100+ year service life of the bridge are difficult to predict because vessel traffic and river-level conditions vary from year to year and economic trends for maritime commerce may change over time." This is not sufficient to satisfy NEPA.

51. NEPA requires that agencies deal rigorously with data gaps and forecasts. "While 'foreseeing the unforeseeable' is not required, an agency must use its best efforts to find out all that it reasonably can." *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1136 (9th Cir. 2011) (quoting *City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir. 1975)). The statute requires that agencies "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document." 42 U.S.C. § 4332(2)(D). They must also "make use of reliable data and resources" in carrying out NEPA. 42 U.S.C. §



SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Vancouvercenter
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone 360-694-7551

4332(2)(E).

52. The FSEIS fails also in its economic analysis relating to navigation. The Land Use and Economic Activity effects analysis, section 3.4, and supporting technical reports, offer no meaningful information on the effect of the project on the overall economy. This information is essential to a reasoned choice. For example, the environmental impact statement for the replacement of the Woodrow Wilson Bridge in Virgina/Maryland evaluated the economic impact of a lower fixed span. This found that the drawbridge would cost $41–77 million and the estimated economic benefits lost would be $111–178 million, more than two-to-one. That information permitted a reasoned choice to continue with a drawbridge on the Capital Beltway/Interstate 95, one of the busiest crossings in the nation. The FSEIS claims that the Modified LPA "would be expected to have limited, at most, impact on future upriver economic activity" and that "economic effects are anticipated to be similar across all design options." The lack of information supporting these conclusions prevents the hard look that NEPA requires.

53. The NIR and the FSEIS Navigation discussion are also inconsistent with Coast Guard procedures. This reveals serious gaps in the effects analysis.

54. In the BPAG, Section G of Appendix A directs an applicant to include a description of "the present and … prospective commercial navigation and the cargoes moved on the waterway" It asks whether "the proposed bridge(s) [will] affect the safe, efficient movement of any segment of the present or prospective commercial fleet operating on the waterway?" In answering that question, the applicant is directed to provide vessel-specific details. In the same section, the applicant is asked whether the proposal will "impact existing and future cruise ship ports-of-call/terminals" or if "the proposed bridge(s) clearance [will] impact present and/or prospective upstream commercial activity, e.g., jobs and economic growth and development". If the answer to the latter question is yes, the applicant must address "any existing or planned commercial/industrial developments negatively affected by



SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Vancouvercenter
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone 360-694-7551

the proposed clearances and discuss the economic impacts the proposed clearances will have on these businesses."

55. The applicant must also "[p]rovide input from waterway depend[e]nt facilities concerning future use;" describe "land use zoning along the waterway (particularly within the riparian zone);" and "[i]nclude input from facilities based on business plans." Section G concludes by seeking "any additional information concerning the potentially impacted or burdened users of the waterway as well as the future use of the waterway." Section I asks whether the bridge will block access to any local service providers and whether those providers are "considered critical infrastructure, key resources, or important/unique U.S. industrial capability (i.e., are these facilities unique or one of only a few of the type in the area?)" The applicant must "[a]ddress whether the proposed clearances negatively affect those facilities and their customers."

56. The identification of reasonably foreseeable actions and effects is too narrow. The FSEIS focuses on the construction footprint of the new bridge, which is coextensive with the "primary study area" for the IBR Program. This does not adequately account for the full scope of effects from the project. As in *Preserve Our Island v. U.S. Army Corps of Engineers*, this "narrow geographic focus and limitation on future events to be considered undercut the scope and effect of the cumulative effects analysis." No. C08-1353RSM, 2009 WL 2511953, at *17 (W.D. Wash. Aug. 13, 2009). The effects analysis should be expanded to fully consider all types of impact, not just the physical footprint of the bridge and highway.

57. The FSEIS does not adequately evaluate the impacts of the selected alternative because it defers decision on final bridge design to a later date. There is not sufficient evaluation of the effect of a fixed span rather than movable span. Thus, the FSEIS is not specific enough to foster informed decision-making and violates NEPA. *See City of Tenakee Springs v. Block*, 778 F.2d 1402 (9th Cir. 1985); *Se. Alaska Conserv. Council v.*



SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Vancouvercenter
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone 360-694-7551

*U.S. Forest Serv.*, 443 F. Supp. 3d 995 (D. Alaska 2020).

58. For the above reasons, the FSEIS failed to take a hard look at navigational impacts and is therefore arbitrary and capricious.

**THIRD CLAIM FOR RELIEF**

**(Violation of Rivers and Harbors and Bridge Acts)**

59. Paragraphs 1–58 are hereby incorporated by reference.

60. The Rivers and Harbors Act of 1899 and the General Bridge Act prohibit the construction of bridges that are unreasonable obstacles to navigation.

61. The IBR bridge with a 116′ vertical clearance is an unreasonable obstacle to navigation. It does not allow for passage of a significant amount of marine traffic and it permanently constrains Iron Partners' access to the mainstem of the Columbia River. This effectively precludes Iron Partners from bidding on large-scale projects that would necessitate riverine transportation from the inception of construction going forward indefinitely.

62. The Amended ROD violates the Rivers & Harbors Act and General Bridge Act and is therefore "contrary to law" in violation of the APA.

**FOURTH CLAIM FOR RELIEF**

**(Violation of APA – Arbitrary and Capricious Agency Action)**

63. Paragraphs 1–62 are incorporated by reference.

64. The Amended ROD relied on an incomplete and inadequate FSEIS, on a faulty navigation impact report, and on a PNCD produced under non-standard procedures.

65. Accordingly, the Amended ROD failed to consider important aspects of the problem and reached a decision counter to the evidence.

66. This renders the Amended ROD arbitrary and capricious.



SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Vancouvercenter
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone 360-694-7551

## PRAYER FOR RELIEF

WHEREFORE, plaintiff requests that the Court issue the following relief:

1. A Declaration that the FSEIS and Amended ROD violate NEPA, are arbitrary and capricious and otherwise in violation of law.

2. An Order vacating and remanding the FSEIS and Amended ROD to FHWA and FTA.

3. Injunctive relief prohibiting commencement of demolition or construction until an adequate NEPA document is prepared;

4. Plaintiff's attorney fees and costs pursuant to 28 U.S.C. § 2412, Fed. R. Civ. P. 54(d), and any other applicable authority; and

5. Such other and further relief as the Court may allow.

Dated this 6th day of October, 2026.

SCHWABE, WILLIAMSON & WYATT, P.C.

By: ______________________________

Lawson E. Fite, WSBA #44707
Email: lfite@schwabe.com
Stephen W. Horenstein, WSBA #6183
Email: shorenstein@schwabe.com
Vancouvercenter
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone: 360-694-7551
Facsimile: 360-693-5574

*Attorneys for Plaintiff*



SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Vancouvercenter
700 Washington Street, Suite 701
Vancouver, WA 98660
Telephone 360-694-7551